IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHARLES BUCHANAN,

                Plaintiff,                Case No. 3:05 CV 7120

-vs-

                                      MEMORANDUM OPINION

WARREN BURBURY, etc., et al.,

                Defendant.

KATZ, J.

On March 23, 2005, Plaintiff filed his complaint against the Warden and several "religious" officials, in their official capacities, at North Central Correctional Institution, Marion, Ohio. ("NCCI"). Plaintiff sought declaratory relief that the Defendants' have denied his various religious accommodation requests in violation of federal and state constitutions; his complaint also included other related charges.

Plaintiff asks for, among other things, a preliminary and permanent injunction against all of the Defendants in their official capacities, compelling them to accommodate his right to eat Kosher meals, right to have work proscriptions for the Sabbath and all Holy Days, and the right to view Yahweh's New Covenant Assembly ("YNCA") videotapes and/or listen to YNCA audio tapes of worship services in a NCCI worship facility. Contemporaneously with the filing of his complaint he filed a motion for a temporary restraining order ("TRO").

On July 15, 2005, the Court held a hearing on the combined TRO and preliminary injunction motions. Each party had the opportunity to and did, in fact, produce witnesses and evidence, and subsequently filed post-hearing briefs. The Court has now reviewed all pertinent

memoranda and affidavits in support of the positions of the parties and will grant Plaintiff's prayer for a preliminary injunction upon terms and pursuant to conditions hereinafter set forth.

## BACKGROUND

Plaintiff is incarcerated at NCCI and claims to be a sincere adherent to Yahweh's New Covenant Assembly, a Sacred Name Sabbatarian faith group that, like Christians, believes in a messiah, but that has little else in common with mainstream Christianity. Sacred-Name Sabbatarians call the entity Christians and Jews know as God "Yahweh," and call the Christian messiah Jesus "Yashua." They find the terms "God" and "Jesus," and the symbols of the cross and the Holy Trinity, to be offensive and blasphemous. Plaintiff claims that among the central tenets of his faith are that he eat "clean meats" as demanded by his interpretation of the Bible; that he worship with other Sabbatarians in a worship service using the Sacred Names; and that he refrain from working on the Sabbath (Saturday) and on seven Holy Days observed by that sect. He asserts that these beliefs are fundamental to his free exercise of his chosen religion.

The State of Ohio and NCCI group prisoners into religious "catchments," for example, "Roman Catholic," "Protestant Christian," or "Jewish," among others. Members of a particular catchment are treated identically for the purposes of religious accommodations and must worship together. For example, Lutherans and Southern Baptists worship together in the Protestant Christian services. Defendants have refused to accommodate Plaintiff's core beliefs, in part, because they have classified him as a Protestant Christian. Buchanan posits that that catchment is fundamentally incompatible with his Sabbatarian faith, and asks that he be placed in a separate catchment.

The Defendants' refusal to provide Plaintiff with Kosher food is also based on the purportedly higher cost of doing so and on Defendants' concern that allowing Plaintiff to eat Kosher food will open a floodgate of other requests for that fare. Defendants argue that there is no space available in the chapel or multipurpose area and no time when those areas are available to allow Plaintiff and other Sabbatarians to worship as a group, and that allowing them to do so would create a security risk. Finally, the Defendants claim that allowing Plaintiff work proscriptions on his Sabbath and on Holy Days would amount to an undue burden and encourage others to feign conversion to Plaintiff's religion in order to get more days off.

In light of the recent United States Supreme Court decision in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Court invited the parties to file post-hearing briefs. Each of the parties did so and Plaintiff filed a reply brief.

Plaintiff asserts that he has satisfied his burden of proof under the Religious Land Use and Incarcerated Persons Act ("RLUIPA" or "the Act") and has demonstrated that NCCI has substantially burdened his core religious beliefs. He further asserts that the Defendant institution must demonstrate that the burdening of his religion is necessary to further a compelling governmental interest by the least restrictive means.

Defendants first argue that the Court should deny Plaintiff's motion for injunctive relief because, under the pre-RLUIPA standard looking to what Plaintiff's religion *mandates* and to whether the state's infringement is reasonably related to a legitimate penological interest, Plaintiff cannot show a likelihood of success on the merits. Alternatively, they argue that the standard under RLUIPA, if it does apply, is unclear due to pending cases that could interpret the Act. They argue that Plaintiff's religion does not require him to eat Kosher as defined by Jewish Oral Law,

3

and that granting Plaintiff's request for work proscriptions on "71 days total" would force the state to grant the same accommodation to 40,000 other prisoners, crippling the operation of the prison, which depends on prisoner labor. They insist that the Court must defer to the judgment of the prison officials on these matters. Finally, Defendants make much of the fact that Plaintiff will not be excommunicated if his requests are denied, and they argue that his religious exercise is not burdened because there are ample alternative means for him to pursue his faith.

## DISCUSSION

*A. Preliminary Injunction Standard*

The granting or denial of a preliminary injunction is within the sound discretion of the trial court. *Virginia Railway Co. v. System Federation, R.E.D.*, 300 U.S. 515, 551 (1937). The Sixth Circuit has set forth four standards for the District Court to use in making this determination: (1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiffs have shown that irreparable injury will result if the preliminary injunction is not granted; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether issuing a preliminary injunction would serve the public interest. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001).

*B. Likelihood of Success on the Merits*

Rather than regurgitate all of the evidence which was heard, both at the hearing and through subsequent affidavits (which the Court invited and which will be accepted for whatever value each of those affidavits and/or statements may prove), the Court will address the issues necessary to establish the right of Plaintiff to a preliminary injunction.

The Plaintiff's claims are governed by Section Three of RLUIPA, which provides that: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden "is in furtherance of a compelling governmental interest," and "is the least restrictive means" of doing so. 42 U.S.C. § 2000cc-1(a).[1]

"Religious exercise" under RLUIPA "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This means that "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion," but "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 n.13. In other words, "[t]he 'truth' of a belief is not open to question; rather, the question is whether the objector's beliefs are 'truly held.'" *Id.* (internal quotations omitted). The Supreme Court has explained that "'[t]he 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine.'" *Cutter*, 544

---

[1] It is somewhat unclear why Defendants believe RLUIPA does not apply. They first posit, without citing any authority, that "[f]ailure to plead a statutory violation under RLUIPA[] results in the application of the constitutional standard under *Turner* [*v. Safely*, 482 U.S. 78 (1987)]." (Doc. No. 26, p. 5). However, they then acknowledge that Plaintiff did in fact state a RLUIPA claim in his complaint. They also argue that this Court should not apply RLUIPA because cases in which RLUIPA could be construed are pending before the Sixth Circuit. The Court rejects this argument: RLUIPA's constitutionality has been upheld, and the Court fails to see why a constitutional statute should not be applied, merely because the Court of Appeals is considering a case involving the same statute. In any event, the Sixth Circuit has decided *Hoevenaar v. Lazaroff*, the case Defendants cite to, and the Court is familiar with that opinion. *See* 422 F.3d 366 (6th Cir. 2005).

U.S. at 720 (quoting *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)) (alterations in *Cutter*, save initial lowercasing).

The Supreme Court in *Cutter* upheld the constitutionality of RLUIPA, and in doing so, provided guidance that is relevant to this case. First, the Court cited to the Act's legislative history, wherein "Congress documented, in hearings spanning three years, that 'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise." *Id*. at 716 (quoting 146 Cong. Rec. S7774, S7775 (July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy on RLUIPA) (hereinafter "Joint Statement")). The Court quoted the statement of the bill's sponsors that "'[w]hether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways.'" *Id*. (again quoting the Joint Statement)). As a "typical example" of what the congressional hearings revealed, the Court cited to "'a state prison in Ohio [that] refused to provide Moslems with Hallal food, even though it provided Kosher food.'" *Id*. at 716 n.5 (quoting Hearing on Protecting Religious Freedom After *Boerne v. Flores*, before the Subcommittee on the Constitution of the House Committee on the Judiciary, 105th Cong., 2d Sess., pt. 3, p. 11, n. 1 (1998)). Additional examples included failing to provide Jewish inmates with sack lunches that could be eaten after sundown, and prohibiting the lighting of Hanukkah candles while permitting smoking and votive candles. *Id*.

In determining that RLUIPA does not violate the Establishment Clause, the Supreme Court in *Cutter* also declared that:

> RLUIPA does not differentiate among bona fide faiths. In *Kiryas Joel*, we invalidated the state law that carved out a separate school district to serve exclusively a community of highly religious Jews, the Satmar Hasidim. We held that the law violated the Establishment Clause, . . . in part because it "singled out a particular religious sect for special treatment . . . ." RLUIPA presents no such

> defect. It confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment."

544 U.S. at 723-24 (internal citations omitted). In other words, RULIPA treats all faiths on the same footing. *Id*. at 720 ("Properly applying RLUIPA, courts must . . . be satisfied that the Act's prescriptions are and will be administered neutrally among different faiths.")

RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id*. at 722. The Act's drafters "were mindful of the urgency of discipline, order, safety, and security in penal institutions," and "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id*. at 723 (quoting the Joint Statement at S7775). However, as several other district courts have articulated, "prison officials 'cannot merely brandish the words "security" and "safety" and expect that their actions will automatically be' insulated from scrutiny." *Farrow v. Stanley*, 2005 U.S. Dist. LEXIS 24374, at *28 (D.N.H. Oct. 20, 2005) (quoting *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994)).

The Court in *Cutter* considered the argument that RLUIPA encourages prisoners to "get religion" in order to gain access to privileges accorded under the Act, and rejected that argument:

> While some accommodations of religious observance, notably the opportunity to assemble in worship services, might attract joiners seeking a break in their closely guarded day, we doubt that all accommodations would be perceived as "benefits." For example, congressional hearings on RLUIPA revealed that one state corrections system served as its kosher diet "a fruit, a vegetable, a granola bar, and a liquid nutritional supplement -- each and every meal."

7

> The argument, in any event, founders on the fact that Ohio already facilitates religious services for mainstream faiths. The State provides chaplains, allows inmates to possess religious items, and permits assembly for worship.

*Cutter*, 544 U.S. at 721 n.10 (internal citation omitted). In *Cutter*, the argument that providing accommodations for the exercise of religion would lead to a "copycat" or "domino" effect went to the Act's tendency to promote or establish religion, not to the government's interest in burdening the religious expression. However, the Supreme Court's response to that argument seems just as applicable here, where Plaintiff seeks nothing the state does not already provide to other inmates.

The Court finds that Plaintiff has shown that it is substantially likely that he will be able to prove that the state has substantially burdened his religious exercise, and that the state will not be able to demonstrate that it has done so in the furtherance of a compelling governmental interest and by the least restrictive means.

Initially, the Court finds it quite likely Plaintiff can show that attending group worship sessions, refraining from working on the Sabbath and on High Holy Days, and eating Kosher food are all part of his "religious expression."

First, as stated above, "'[t]he 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine.'" *Cutter*, 544 U.S. at 720 (quoting *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)) (alterations in *Cutter*, save initial lowercasing). Both Plaintiff and Bishop Jacob Meyer, whom the Court allowed to testify as an expert in Sacred Name Sabbatarianism, testified that group worship using the Sacred Names is a core tenet of their religious practice. (Doc. No. 21, pp. 26-27, 109).

8

Second, Bishop Meyer testified that the High Holy Days cannot be separated from the Sabbath. *Id*. at 111. Both Plaintiff and Bishop Meyer testified that to work on the Sabbath or on Holy Days is to sin and to be cut off from or rejected by Yahweh. *Id*. at 40, 110. Bishop Meyer, for example, makes the coffee that he will drink on the Sabbath the night before, and consumes it cold, in order to refrain from working on the Sabbath. *Id*. at 110.

As to Plaintiff's desire to eat NCCI's Kosher food, Defendants argue that Plaintiff's religion, which does not follow the Jewish Oral Law, but relies solely on the dietary requirements set forth in Leviticus and Deuteronomy, does not require that he eat Kosher meals, and that a vegetarian diet at NCCI would suffice. Therefore, Defendants argue, eating Kosher meals is not part of Plaintiff's religious expression.

The affidavits of YNCA Elder Ron Davis in conjunction with the testimony of Bishop Meyer indicate to this Court that the desire for "clean" meats, while a central tenet of the Sabbatarian religious beliefs, is not one universally mandated. Like other religious tenets, such as kosher meat for religious Jews, Mass observance for Catholics, etc., it may be a central aspect of the religion, but violation thereof would not be grounds for excommunication. It clearly appears to the Court, however, that that is not the operative question; the question is whether, having determined that it is a core belief or tenet of the religion, adherence thereto is so intertwined with a particular member's view and practice of his religious faith that it becomes one which is capable of being met without obstructing the institution in fulfilling its mandate for inmate and employee safety. While Defendants presented an affidavit from Elder Ron Davis, of Plaintiff's church, who states that a diet that is not specifically "Kosher" can be appropriate, (Doc. No. 26-2), Bishop Meyer testified that, often times, "Kosher" meats and foods are the only ones that can be found

9

that adhere to the Biblical laws of "clean meats" (Doc. No. 21, p. 106 ("If I can't be there to do my own slaughtering, then I have to rely on someone, and I prefer to rely on a good rabbi.")). Without rehashing all of the testimony which this Court heard and read, clearly Buchanan has adopted a stricter view of his religious beliefs than may have others, but this Court cannot say that those beliefs are unjustified as tenets of the religion of which he is an adherent. *See, e.g.*, *id.* at 107 (Bishop Meyer's testimony that to be properly cleaned, vessels must be fired with a blowtorch)). The vegetarian fare at NCCI, prepared in a way that is not "clean" as Plaintiff views that religious requirement, *id.* at 67, does not meet his religious needs. *See Cutter*, 544 U.S. at 725 n.13 ("The 'truth' of a belief is not open to question; rather, the question is whether the objector's beliefs are 'truly held.'") (internal quotations omitted).

As to the sincerity of Plaintiff's beliefs, Defendants posit that his purchases of non-Kosher food from the commissary show that his professed beliefs are not sincerely held. However, the Court finds credence in Plaintiff's testimony and the affidavits of fellow inmates stating that he purchased each of the non-Kosher items as a gift or favor for friends, and the testimony that, for example, Plaintiff often trades his meat for another inmate's cheese when cheeseburgers are served, so as not to mix meat and milk in violation of his religious beliefs. (Doc. No. 21, pp. 60-62, 68-70; Doc. Nos. 24-2, 24-3, 24-4). The Court finds that it is likely Plaintiff can show that eating Kosher meals at NCCI is part of his religious expression.

Where a state puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). Here, the state has completely prohibited Plaintiff from attending group worship that uses the Sacred Names, from resting on the Sabbath, and from consuming

10

"clean" food, forcing him to modify his behavior and violate his beliefs. Therefore, Plaintiff likely can show his religious exercise has been substantially burdened.

The question now becomes whether it is substantially likely the Defendants can show that denying Plaintiff the opportunity for group worship, rest on the Sabbath and Holy Days, and NCCI's Kosher food serves a compelling state interest. The Court finds that it is not. It is clear that safety, security, order, and the effective functioning of the prison are legitimate state interests that can outweigh a prisoner's right to religious exercise. However, the Court finds it unlikely Defendants can show that prohibiting the opportunity for group worship, disallowing work proscriptions one day per week for the Sabbath and on seven other Holy Days per year, and not providing Kosher food further any of these state interests, because the state already does all of those things for other prisoners, apparently with no ill effects (as none were advanced by Defendants).

The testimony at the hearing clearly demonstrated that kosher meals are provided to others within the institution and that the cost thereof is approximately the same as that for other meals provided by NCCI to its inmates. (Doc. No. 21, pp. 124-25). Since that is the evidence before the Court, it appears clearly that NCCI is capable of meeting the request of Buchanan without undue burden from a cost standpoint and without interfering with or impeding its obligation as a penological institution. Providing kosher meals to this Plaintiff will not adversely impact the safety or good order surrounding the institution.

Additionally, it is uncontroverted in the record that NCCI does not require the majority of Jews, Christians, or Catholics to work on their Sabbaths, or require Jews to work on High Holy Days. *See* (Doc. No. 24-9, p. 3) (Jewish inmates receive ten days off for holidays annually). If

11

these accommodations can be made for others while maintaining order and the effective operation of the prison, they can be provided to Plaintiff as well.

Moreover, because others have the right to gather for performance of religious services, providing space for such services to Sabbatarians would not place an undue burden upon the Defendant institution. Indeed, Plaintiff presents affidavits from several inmates indicating that often religious services are held without chaplains or guards, and that a guard merely sits at a desk in the hallway and sticks his head into the rooms occasionally to monitor the activities. (Doc. No. 24-5, ¶ 8-11 (Jehovah's Witnesses); Doc. No. 24-6, ¶¶ 9-11 (Muslims); Doc. No. 24-7, ¶¶ 9-14 (Gideon Service); Doc. No. 24-8, ¶ 2 (regarding Buddhists, Jehovah's Witnesses, and "Christians in the Hood"). The services themselves are led by outside volunteers. *Id*. Plaintiff has presented the affidavit of a law clerk who found several open time blocks in the multi-purpose/chapel area, (Doc. No. 24-10), and letters from two civilian Sabbatarian leaders who express their willingness to lead services at NCCI, *see* (Doc. No. 24-9, pp. 4-7). The Court fails to see how establishing a group worship service for Sacred Name Sabbatarians would infringe upon the efficient operation of the prison or overburden prison resources.

Plaintiff and others similarly situated should have the right to gather, with an outside Sabbatarian religious leader, or, in the alternative, to view video tapes which would constitute the services of the religious adherents. However, should Buchanan wish to listen to audio tapes of religious services or other religious materials, the institution may require that that be done within the confines of his own cell unless a separate room is readily available and would not impose an undue burden on the institution.

Finally, the Court rejects Defendants' argument that granting Plaintiff's requests would negatively impact the effective operation of the prison by inducing others to "convert" and make similar requests. Plaintiff asks for nothing that is not already available to other inmates, apparently without opening a floodgate of false conversions. And, as Plaintiff has testified, NCCI's kosher food is not particularly appetizing.

As found by the Supreme Court in *Cutter*, safety and security, indisputably compelling state interests, outweigh an inmate's claim to a religious accommodation. However, this is not a case in which the Plaintiff seeks an exception to a generally applicable rule that goes to the safety and security of the prison, such as a proscription on long hair. *See Hoevenaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2005). Rather, Plaintiff seeks to engage in religious exercise that other inmates already enjoy. This Court declines to find that enforcement of RULIPA under the circumstances outlined herein would compromise prison security or effectiveness.

The root of the disagreement between the parties in this case appears to result from the state's placement of Plaintiff and other Sacred Name Sabbatarians in the Protestant Christian catchment. Testimony at the hearing clearly reflected that placement of Sabbatarians within the Protestant catchment was inappropriate, as the beliefs held by Sabbatarians, well outlined in the testimony, conflicted with the beliefs of those within the Protestant catchment.

Bishop Meyer testified that he "can't worship with Protestant Christians." (Doc. No. 21, p. 101). Plaintiff stated that the Christian cross refers to a pagan deity symbol, and that the words "Lord" and "God" refer to the false god Baal. *Id*. at 26, 36. Dr. Rolf Bauma, whom the Court accepted as an expert in Protestant Christianity and systematic theology, which "deals with systems or structures of theological thought as it exists in different religious traditions . . .," *id*. at

13

76, testified that, "if a Sacred Name Sabbatarian were to come into my [Protestant Christian] worship service, not only would they find it extremely offensive, the only reason that they would have for staying is to proselytize . . ." *id*. at 84. Dr. Bauma further testified to the many differences between Christians and Sabbatarians, and stated that Sabbatarians could be classified as Protestants "[o]nly with extreme twisting of the terms and with [great] potential for offense to both . . . ." *Id*. at 89. Plaintiff urges the Court to direct that Sabbatarians be placed in their own catchment and, from the evidence adduced at hearing, it is clear to the Court that such should be ordered.

Having found that the denial of Plaintiff's requests does not likely further a compelling state interest, the Court need not reach the question of whether the state's policies are the least restrictive means possible. The Court finds that Plaintiff has shown a likelihood of success on the merits of his claim under RLUIPA.

*C. Other Preliminary Injunction Factors*

In First Amendment cases, the first injunction factor is often determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). This is because the Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury. See *Newsom*, 888 F.2d at 378. Additionally, if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment. See *Connection Distrib.*, 154 F.3d at 288. Moreover, "it is always in the public interest to prevent violation of a party's constitutional rights." *G & V Lounge, Inc.*, 23 F.3d at 1079. The Court finds that the injunction is appropriate.

14

**CONCLUSION**

Based on the foregoing, the Court grants Plaintiff's motion for a preliminary injunction. Defendants shall provide Plaintiff with a Kosher diet as that diet is provided to other inmates presently receiving it; shall not require Plaintiff to work on his Sabbath or on the seven Holy Days designated by his religion; shall provide the Sacred Name Sabbatarians with the opportunity to engage in group worship under the same supervisory requirements imposed on other groups; and shall remove Plaintiff and other Sacred Name Sabbatarians from the Protestant Christian "catchment" and, if necessary to ensure their religious exercise is protected, to place them in a new, separate catchment.

IT IS SO ORDERED.

                                                      s/ *David A. Katz*
                                                      DAVID A. KATZ
                                                      U. S. DISTRICT JUDGE